UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-14263-Cannon/McCabe

FAULMAN INVESTMENT LTD.,

    Plaintiff,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY,

    Defendant.
_____/

## REPORT & RECOMMENDATION

THIS CAUSE comes before the Court on Defendant's Motion for Summary Judgment (DE 33), which was referred to the undersigned by United States District Judge Aileen M. Cannon (DE 43). For the reasons set forth below, the undersigned **RECOMMENDS** that the Motion be **GRANTED IN PART AND DENIED IN PART.**

**I.    FACTS**

This case involves a dispute over life insurance proceeds. In or around 1986, Michael Faulman purchased a whole life insurance policy ("Policy") from Jackson National Life Insurance Company ("Jackson"), naming himself as the insured (DE 40 ¶¶ 1, 2). The Policy had a death benefit of $1.5 million and became active on July 9, 1986 (DE 40 ¶ 1). Faulman later transferred ownership of the Policy to an entity, Faulman Investment Ltd, and this Report and Recommendation will refer to Faulman and his entity interchangeably as "Plaintiff."

**A.    Policy Provisions**

The Policy had several important provisions that play key roles in this dispute.

### 1. Loan Provisions

First, the Policy allowed the policyholder to borrow funds up to the "loan value," which the Policy defined as "the amount shown in the Table of Guaranteed Values for the Policy … or such greater value as may be determined in accordance with the provisions of the Cash Surrender Value section" (DE 34-11 at 13). All outstanding loans bore interest at a rate of eight percent, with unpaid interest being added to the loan balance and bearing interest at the same rate (DE 34-11 at 13).

Next, the Policy had a "default non-forfeiture option" which operated to charge an automatic loan against the Policy for unpaid premiums (DE 42 ¶ 68). Thus, to the extent the policyholder missed a premium payment, the Policy would automatically extend a loan to cover that premium, thereby adding to the total outstanding loan balance against the Policy.

### 2. Vanishing Premium Provision

In addition, the Policy had a "vanishing premium" provision, so named because it allowed the policyholder – after a certain amount of time – to pay premiums out of the accumulated value of the policy (DE 42 ¶¶ 65-66). Jackson described this feature as follows:

> This option, referred to as "vanish," will allow for continuation of life insurance benefits through payment of premiums as a withdrawal from your accumulated values as long as your policy has sufficient (value).

(DE 45-1 at 3).

Starting in 1992, Plaintiff made use of the "vanish" option, thereby agreeing that, "I/we hereby elect to have my/our premium payments deducted from the difference between the [P]olicy's Actual Cash Surrender Value and the Guaranteed Cash Surrender Value" (DE 45-1 at 2).

### 3. Termination Based on Indebtedness

Finally, the Policy had a provision that allowed Jackson to terminate the Policy for excessive indebtedness, provided it complied with certain conditions (DE 34-11 at 13, DE 40 ¶ 3). The Policy defined "Indebtedness" to mean "all unpaid policy loans and loan interest" (DE 34-11 at 13, DE 40 ¶ 3). The provision allowed for termination as follows:

> This Policy will be terminated whenever the total indebtedness equals or exceeds the loan value. Notice will be mailed to the Owner's last known address and to the holder of any assignment of record at least thirty-one days before such termination.

(DE 34-11 at 13, DE 40 ¶ 3). Absent a termination, the Policy provided that any outstanding indebtedness would simply be "deducted from the policy proceeds" upon the death of the insured (DE 34-11 at 13, DE 40 ¶ 3).

### B. Policy Activity – 1986-2020

From 1986 through 1991, the parties agree that Plaintiff paid annual premium payments of $16,085 to Jackson (DE 40 ¶ 5, DE 39-10 ¶ 5). During this time, the Policy accumulated value.

Thereafter, from 1992 through 2013, Plaintiff relied on the "vanish" option to make premium payments (DE 40 ¶ 6, DE 39-10 ¶ 6). That is to say, Plaintiff made no additional premium payments during this time and instead relied upon the accumulated value of the Policy to make those payments.

In 2014, Plaintiff took a $50,000 loan against the Policy (DE 42-3, DE 40 ¶ 7, DE 39-10 ¶ 7). Interest began accruing immediately on this loan (DE 42-3; DE 40 ¶ 7; DE 39-10 ¶¶ 7, 12).

The parties dispute how the premiums were paid in 2014 and 2015 (DE 34 ¶ 8, DE 42 ¶ 8). Jackson maintains that Plaintiff took additional loans against the Policy to pay the annual premiums for each of these years (DE 39-10 ¶ 8). Plaintiff, meanwhile, maintains that it paid at least one of those premiums by way of a check dated September 7, 2015, and that no additional loan should have been taken for the premium covered by that check (DE 42 ¶ 8, DE 40-6).

3

In 2016 and 2017, the parties agree that Plaintiff paid the annual premiums by way of checks written to Jackson (DE 42 ¶ 9). As such, no additional loans were taken for these premiums.

The parties dispute how the premiums were paid from 2018 through 2020 (DE 34 ¶ 10, DE 42 ¶ 10). Jackson again maintains that Plaintiff took additional loans against the Policy to pay the annual premiums in each of these years (DE 39-10 ¶ 10). Plaintiff, meanwhile, maintains that it paid the premium for at least one of these years by way of a check dated August 24, 2020, and that no additional loan should have been taken for the premium covered by that check (DE 42 ¶ 10, DE 40-7).

### C.     Activity in 2021

Issues related to Policy accounting came to a head in late 2021, with the following activity.

#### 1.     Annual Statement

First, on or about July 9, 2021, Jackson generated an Annual Statement covering the period from July 9, 2020 to July 9, 2021 (DE 42-5, DE 42 ¶ 83, DE 45 ¶ 83). The statement reflected the following values, among others:

| | |
|---|---|
| Ending Value Accumulation: | $131,052.05 |
| Loan Indebtedness: | $129,664.59 |
| Net Cash Surrender Value: | $1,387.46 |

(DE 42-5).

According to Jackson, the numbers reflected on this annual statement were inaccurate, so Jackson never mailed this statement to Plaintiff (DE 45 ¶¶ 83, 84). At deposition, Jackson's representative described the statement as "system generated" and said it was "pulled from being sent … because the values were incorrect" (DE 42-4 at 172-73). In truth, Jackson contends, the Policy was "overloaned" as of March 9, 2021, meaning that the total indebtedness exceeded the loan value in July 2021 (DE 34 ¶¶ 14-15, DE 39-10 ¶¶ 14-15).

### 2. Grace Period Notice

Next, on or about July 19, 2021, Jackson generated a "Grace Period Notice" (DE 42 ¶ 73). The Grace Period Notice advised Plaintiff that the annual premium of $15,425.00 was overdue and that Plaintiff needed to pay the premium to keep the Policy in force:

> We encourage you to keep your policy in force and to maintain its death benefit protection. However, your policy will lapse and all coverage under this policy will end on August 9, 2021, unless we receive a minimum payment of $15,425.00 by that date.

(DE 42 ¶ 74, DE 40-8).

Jackson mailed the Grace Period Notice to Plaintiff's last known address in Vero Beach, Florida (DE 45 ¶ 73). Plaintiff admits that it received this letter at the Vero Beach address (DE 42 ¶ 73).

### 3. Pre-Termination Notice

Within days of the Grace Period Notice, on or about July 26, 2021, Jackson generated another letter, hereafter referred to as the "Pre-Termination Notice" (DE 34-12, DE 34 ¶ 25, DE 39-10 ¶ 25). The Pre-Termination Notice stated that the Policy was overloaned and that Plaintiff needed to deposit additional funds to keep the Policy in force:

> In accordance with your Policy, we are informing you that the total indebtedness against your Policy has exceeded its cash value.
>
> Please make a payment of $26,986.00 to keep the policy in force until your July 29, 2022 anniversary.
>
> If we do not receive the full payment from within 31 days of this letter, your policy will terminate.

(DE 34-12). The Pre-Termination Notice did not identify the amount of the Policy's total indebtedness, or the amount of the existing cash value, nor did it explain how Jackson calculated the amount due to be paid, i.e., $26,986.00 (DE 34-12).

5

The Pre-Termination Notice bore the same Vero Beach address as the Grace Period Notice (DE 40-8, DE 34-12). Jackson maintains that it mailed the Pre-Termination Notice on the same day it was generated, and Jackson has provided the Court with a declaration attesting to its standard practices for mailing letters of this type (DE 34 ¶¶ 25, 30; DE 39-10 ¶¶ 16-32). Plaintiff maintains it did not receive the Pre-Termination Notice and that Jackson cannot prove mailing (DE 42 ¶ 25; DE 34 ¶¶ 58-59; DE 42-9 at 35-38; DE 42-10 at 43, 47-48). In support, Plaintiff attests that it never received any such letter, and Plaintiff has provided the Court evidence as to its standard practices for receiving letters of this type (DE 42 ¶¶ 54; DE 42-7 at 69-73; DE 42-9 at 35-38; DE 42-10 at 43, 47-48; DE 34 ¶¶ 58-59).

### 4. Plaintiff's Response to the Grace Period Notice

As stated, Plaintiff admits that it received the Grace Period Notice. To that end, on August 4, 2021, Brenda Faulman, the wife of Michael Faulman, called Jackson on the telephone in order to make the annual premium payment identified in the Grace Period Notice (DE 42 ¶¶ 70, 75-79). At the time she made the call, Brenda Faulman was not the owner, insured, or beneficiary of the Policy (DE 40 ¶ 34). When prompted, however, Brenda Faulman identified "the amount of the premium" then due as $15,425.00 (DE 40 ¶¶ 36-37, DE 42 ¶ 76). She then authorized a check by phone payment, thereby paying the annual premium in full (DE 40 ¶ 37, DE 42 ¶ 77). At the conclusion of the telephone call, Jackson's representative advised Brenda Faulman "just so you know that [the] [P]olicy will be considered paid as of today" (DE 42 ¶ 79).

### 5. Termination

Approximately one month later, on September 9, 2021, Jackson's internal systems automatically terminated the Policy based on Plaintiff's failure to deposit the sum specified in the Pre-Termination Notice, i.e., $26,986.00 (DE 42-12, DE 39-10 ¶ 37). Jackson did not generate or mail a separate notification to Plaintiff to advise of the termination (DE 42 ¶ 98).

On that same date, however, Jackson also generated correspondence to Plaintiff, purporting to process a request to surrender the Policy (DE 42-6). The letter, bearing Plaintiff's Vero Beach address, indicated that "[t]he proceeds of this surrender were distributed per your request," and it set forth the following Policy values as of September 9, 2021:

| | |
|---|---|
| Base Accumulation Value: | $153,452.27 |
| Outstanding Policy Loan: | $131,426.60 |
| Net Proceeds: | $22,025.67 |

(DE 42-6).

The record does not reflect that Plaintiff ever requested a surrender of the Policy, so the record remains unclear why Jackson generated this letter. Jackson claims it never sent this letter to Plaintiff, among other reasons, because numbers reflected in the letter were incorrect (DE 42 ¶¶ 86, 89).

### 6.    Death & Denial of Coverage

Approximately one month after Jackson's internal termination, on October 8, 2021, Michael Faulman passed away (DE 40 ¶ 43). Plaintiff notified Jackson and made a claim on the Policy proceeds on or about November 12, 2021 (DE 42 ¶ 81, DE 40-10 at 2).

On January 18, 2022, Jackson denied the claim (DE 42 ¶ 98, DE 42-12). In support, Jackson cited to the Pre-Termination Notice and Plaintiff's failure to deposit the sums specified in that notice (DE 42-12). Jackson took the position that "[t]he policy terminated on September 9, 2021 due to the loan balance exceeding the Policy's accumulation value and Jackson not receiving a timely loan payment" (DE 42-12).

Plaintiff thereafter filed this suit alleging breach of contract (Count I) and declaratory relief (Count II) (DE 1). This Motion followed.

## II.     SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show "there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (cleaned up).

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Also, the Court must resolve ambiguities and draw justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### III. DISCUSSION

Jackson moves for summary judgment on both counts of the Complaint. The Court will address each in turn.

#### A. Count I – Breach of Contract

Jackson first argues summary judgment should be entered on Count I because the undisputed facts show that Jackson terminated the Policy prior to Michael Faulman's death and, as such, Jackson had no obligation to pay the death benefit (DE 33 at 1). Under Florida law, an insurer bears the burden of proving cancellation of an insurance contract in accordance with the policy's terms. *Umerah v. John Hancock Life Ins. Co. (USA)*, 458 F. App'x 880, 881 (11th Cir. 2012). When construing insurance policy language, courts must construe all terms "liberally in favor of the insured and strictly against the insurer." *Berkshire Life Ins. Co. v. Adelberg*, 698 So. 2d 828, 830 (Fla. 1997).

Applying that standard here, the Court finds summary judgment cannot be granted because genuine issues of material fact remain on two issues: (1) whether Jackson had a right to terminate the Policy in the first instance, and (2) if so, whether Jackson mailed the Pre-Termination Notice.

##### 1. Right to Terminate

The Policy allowed for termination only when "the total indebtedness equal[ed] or exceed[ed] the loan value" (DE 34-11 at 13, DE 40 ¶ 3). To show a valid termination, therefore, Jackson must demonstrate its correct calculation of "total indebtedness" and "loan value." On review of the record, the Court finds genuine issues of material fact remain on both calculations.

As to "total indebtedness," the parties disagree as to how much money Plaintiff borrowed. Specifically, Jackson maintains that Plaintiff took loans from the Policy in 2014, 2015, and 2018 through 2020 to make annual premium payments (DE 34 ¶¶ 8, 10). Plaintiff, meanwhile, maintains that it paid at least two of those annual premiums by way of checks dated September 7, 2015 and

August 24, 2020 (DE 42 ¶¶ 8, 10). These two checks result in a discrepancy of over $30,000.00 between the parties' respective debt calculations, not including interest.

The two checks create a similar discrepancy as to "loan value," which Jackson seems to equate to "cash value."[1] Even if Jackson is correct that loan value and cash value mean the same thing, the cash value would necessarily fluctuate depending upon whether Plaintiff paid an additional $30,000.00 in Policy premiums by way of the two checks. Given the parties' dispute over this issue, a genuine issue of material fact remains.

At deposition, Jackson's representative did not provide clear answers as to how Jackson calculated the total indebtedness and cash value. Jackson's representative conceded she did not have a document that reflected the dates and amounts of premiums paid on the Policy (DE 42-4 at 149-152). Rather, she had "pieced together" this information from the Policy history and "implied" the resulting calculations (DE 42-4 at 149-152).

The Court finds significant the fact that Jackson no longer sells life insurance policies (DE 42 ¶ 62) and that, at times, the calculation of Policy figures had to be turned over to the "manual calculations" department because Jackson could not rely on its "system generated" numbers (DE 42-4 at 172-73). On or about July 9, 2021, for example, Jackson generated an Annual Statement that indicated the Policy had a "Net Cash Surrender Value" of $1,387.46 — meaning that the cash value exceeded indebtedness by $1,387.46 on that date (DE 42-5). According to Jackson, the numbers reflected in the July 9 statement were inaccurate, so Jackson never sent the documents to Plaintiff (DE 42 ¶¶ 86, 89).

---

[1] The Policy gives two alternative definitions of "loan value," one of which refers to the value "as may be determined in accordance with the provisions of the Cash Surrender Value section" (DE 34-11 at 13).

Instead, just two weeks later, Jackson's Pre-Termination Notice claimed that Plaintiff needed to deposit $26,986.00 to keep the Policy in force (DE 34-12). The Pre-Termination Notice provided no explanation as to how Jackson arrived at the amount due, nor has any explanation been included in the summary judgment record (DE 34-12).

Later still, on September 9, 2021, Jackson generated correspondence to Plaintiff purporting to process a request to surrender the Policy (DE 42-6). The letter itself appears to have been a mistake, as the record shows no request for a surrender. Nevertheless, the letter indicated the Policy had "Net Proceeds" of $22,025.67 on that date, meaning that the cash value exceeded indebtedness by $22,025.67 (DE 42-6). The September 9 letter and the Pre-Termination Notice thus painted opposite pictures of the Policy's value at roughly the same time — one indicating the Policy was above water by $22,025.67, and the other indicating that Policy was under water by $26,986.00. According to Jackson, the numbers reflected in the September 9 letter were inaccurate, and Jackson never sent the documents to Plaintiff (DE 42 ¶¶ 86, 89).

Overall, the Court finds the record to be unclear as to the true and correct calculation of the Policy's "total indebtedness" and "loan value" at the time of the purported termination. The Court therefore finds that Jackson has not met its burden, for summary judgment purposes, to show that it had a contractual right to seek termination of the Policy in the first instance. Rather, genuine issues of material fact remain as to the accuracy of Jackson's calculations of excessive indebtedness.

### 2. Mailing the Pre-Termination Notice

Next, the Court finds a genuine issue of material fact remains as to whether Jackson mailed the Pre-Termination Notice. At the outset, Plaintiff concedes that, under the type of notice provision at issue in the Policy, Florida law makes "mailing" the key inquiry, regardless of actual receipt by the policyholder (DE 41 at 5-6). *See Umerah*, 458 F. App'x at 882 (noting that, under

11

similar provision, "sending a notice to the last known address" shifts "the risk of delivery to the insured.") (cleaned up); *Best Meridian Ins. Co. v. Tuaty*, 752 So. 2d 733, 735 (Fla. 3d DCA 2000) (noting that, under similar provision, "[t]he insurer need only establish that the required notices were actually mailed" and "need not establish that the insured actually received the notice").

Here, Jackson has not offered the type of evidence that would conclusively prove actual mailing, such as a postal receipt or a notice of attempted delivery. Instead, Jackson relies on the following circumstantial evidence of mailing:

- A manual note entered by a Jackson representative on July 26, 2021 that states, inter alia, "SENT OL LETTER" (DE 39-13 at 4).

- An automated note entered on July 26, 2021 by the system that prints and stuffs letters into envelopes that states, inter alia, "Overloan Letter sent to Client" (DE 39-13 at 4).

- An overloan spreadsheet that shows when manually generated notices are sent, indicating the Pre-Termination Notice was sent on July 26, 2021 (DE 39-14).

- A document tracking system note that shows when Jackson creates a letter that is not mailed, indicating that no letters were created in connection with the Policy that were not mailed between July 25 and July 31, 2021 (DE 39-15).

- A declaration to establish Jackson's procedures for mailing pre-termination and other notices to policyholders, including the processes for generating, sending to the printing facility, stuffing into envelopes, and placing in a container (DE 34 ¶ 16, DE 39-10 ¶ 16).

- The lack of evidence that the Pre-Termination Notice was returned as undeliverable (DE 34 ¶ 32, DE 39-10 ¶ 32).

Courts have recognized that evidence of this type can be sufficient to make out a prima facie showing of mailing. *See Best Meridian Ins. Co.*, 752 So. 2d at 737 (finding circumstantial evidence sufficient to make a prima facie showing of mailing); *see also Mace v. M&T Bank*, 292 So. 3d 1215, 1219-20 (Fla. 2d DCA 2020) (setting forth three broad categories of circumstantial evidence to show a letter was mailed, including evidence of routine business practices and evidence of records generated upon mailing). Once a prima facie showing has been made, the

12

burden shifts to the opponent to offer evidence of non-mailing. *See Best Meridian Ins. Co.*, 752 So. 2d at 736 (noting that, on summary judgment, a prima facie showing of mailing can be rebutted where "[t]he two sides have presented conflicting evidence on whether the notices were mailed.").

Here, the Court finds that Plaintiff has pointed to sufficient evidence to rebut Jackson's prima facie case, thus creating a triable issue of fact, including the following:

- Jackson's mailing process is automated and has "no human oversight" or "manual oversight" over its automated system for printing letters, stuffing envelopes, applying postage, and placing the envelopes in a crate for mailing (DE 42-4 at 240-41).

- Jackson's tracking of its automated system stops once an envelope is "placed in a container for pick-up" (DE 42-4 at 240-41).

- Jackson's automated systems produced mistakes in this case, including a Policy surrender letter when no surrender was ever requested (DE 42-6) and an annual statement and correspondence with apparently incorrect Policy values (DE 42-5).

- Plaintiff attests that it never received the Pre-Termination Notice (DE 34 ¶¶ 58-59; DE 42-9 at 35-38; DE 42-10 at 43, 47-48), despite having procedures in place for handling mail addressed to Plaintiff or "anybody named Faulman" (DE 42-7 at 73).

- In contrast to the Pre-Termination Notice, Plaintiff admits to receiving the Grace Period Notice generated around the same time as the Pre-Termination Notice (DE 42 ¶¶ 70, 73, 75-79).

- Plaintiff responded promptly to the Grace Period Notice, with Brenda Faulman making the required premium payment within days of receiving it – an indication that Plaintiff would have given similar prompt attention to the Pre-Termination Notice had it been mailed (DE 42 ¶¶ 70, 73, 75-79).

The Court finds this evidence sufficient to create a genuine issue of material fact as to mailing. The evidence goes beyond mere allegations of nonreceipt. *See Best Meridian Ins. Co.*, 752 So. 2d at 737 (noting that mere claim of nonreceipt may not be sufficient to rebut a prima facie case, but can be considered "as one of the multiple facts" to contradict mailing). Accordingly, the Court finds Jackson has not met its burden, for summary judgment purposes, to show actual

mailing of the Pre-Termination Notice.  Rather, a genuine issue of material fact remains on that issue.  For this reason as well, summary judgment should be denied as to Count I.

### B.   Count II – Declaratory Judgment

Finally, Jackson requests the Court to enter summary judgment on Count II, which seeks declaratory judgment.  In support, Jackson argues that Count II is entirely duplicative of Count I for breach of contract.  The Court agrees.

"A trial court should not entertain an action for declaratory judgment on issues which are properly raised in other counts of the pleadings and already before the court, through which the plaintiff will be able to secure full, adequate and complete relief." *Fernando Grinberg Tr. Success Int. Props., LLC v. Scottsdale Ins. Co.*, No. 10-20448-CIV, 2010 WL 2510662, at *1 (S.D. Fla. June 21, 2010) (cleaned up).  This is particularly true when a complaint contains overlapping counts for breach-of-contract and declaratory relief:

> A petition seeking declaratory judgment that alleges breach of duties and obligations under the terms of a contract and asks the court to declare those terms breached is nothing more than a petition claiming breach of contract.  It thus provides an adequate remedy at law, and a decision on the merits of the breach of contract claim would render the defendant's request for declaratory judgment moot or redundant.

*Eisenberg v. Standard Ins. Co.*, No. 09-80199, 2009 WL 3667086, at *2-3 (S.D. Fla. Oct. 26, 2009).

Here, Count I alleges breach of contract and requests damages for Jackson's failure to pay the Policy's death benefit (DE 1-1 at 9-10).  Count II seeks a declaration of rights over the same essential issues (DE 1-1 at 10-12).  A resolution of Count I would render Count II moot, and the Court thus finds Count II to be redundant and unnecessary.  The Court therefore recommends that Count II be dismissed.  The Court recommends dismissal, rather than entry of summary judgment,

to avoid any misconception that the Court has declared the rights of the parties – one way or the other – via the entry of a judgment on Count II.

## IV. <u>RECOMMENDATION & NOTICE OF RIGHT TO OBJECT</u>

Based on the foregoing, the undersigned **RECOMMENDS** that the Motion (DE 33) be **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Motion should be **DENIED** as to Count I.

2. The Motion should be **GRANTED** as to Count II, which should be dismissed.

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with United States District Judge Aileen M. Cannon.   Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach in the Southern District of Florida, this 21st day of July 2023.

_____
RYON M. MCCABE
U.S. MAGISTRATE JUDGE